Dec. 1840.

Hutchinson
v.
Brown.

Brown
v.
Hutchinson.

---

## HUTCHINSON vs. BROWN.
## BROWN vs. HUTCHINSON.

Where upon a sale of property, both the buyer and seller have the property before them, and subject to their inspection and examination, an assertion by the vendor as to the value of the property, though false, affords no substantive ground of relief in behalf of the purchaser. It is merely an opinion as to which the purchaser is as capable of forming a judgment as the seller.

False representations by the vendor as to the actual income or receipts from the property which is the subject matter of sale, may be taken as evidence of fraud.

An agreement obtained from a man in a state of intoxication, which intoxication was produced by the procurement or contrivance of the party obtaining the agreement, will be set aside as fraudulently obtained.

To entitle a party to introduce proofs that an agreement was obtained from an intoxicated person, an allegation to that effect must be made in the pleadings, particularly when it is sought to be proved that the intoxication was induced by the procurement or contrivance of the party obtaining the agreement.

And without such allegations such proofs will not be received, even though the pleading states that the party "used many other frau- "dulent devices to deceive and defraud;" this allegation is too vague and general to admit proofs of intoxication.

THE first of these suits is brought for the purpose

of foreclosing a mortgage upon certain lands in Williamsville, in the county of Erie; and the second is a cross bill, or a bill in the nature of a cross bill, to set aside the conveyance of the same lands upon which the mortgage was given, as fraudulent. The bill in the second cause states that the defendant falsely, fraudulently, and deceitfully represented to the complainant that the premises were worth more than $10,000; and that the profits of keeping tavern thereon, over and above all expenses and charges, were more than the interest of $10,000 at 7 per cent. and that the said defendant falsely represented that he had been recently offered the sum of $10,000 for the same; and that he used many other fraudulent devices to deceive and defraud the complainant in the sale of said premises, and did defraud him to the amount of $6,000. Both causes were heard at the same time, upon pleadings and proofs. The other facts in the case will sufficiently appear from the opinion of the court.

*H. Barton,* solicitor for complainant in 1st suit, and defendant in the 2d.

*W. H. Green,* solicitor for defendant in 1st suit, and complainant in the 2d.

THE VICE CHANCELLOR. This is, as to its essential equity, a case of fraudulent representations in the sale of real estate—a class of cases which generally elicits a voluminous mass of testimony, a fact which this case fully proves, as I have to wade through a mass of more than one thousand legal pages of testimony to get at the materials for making up an intelligent and satisfactory decision. Having

performed this labor, it only remains to sum up the results, and apply the law to the facts as they are brought before us in the testimony of the witnesses. It appears from such testimony, that Brown, one of the parties to these suits, was a native of Pennsylvania, where he was left an orpham child under the care of guardians, with a considerable property. Before he became of age he had been addicted to habits of intemperance, which he did not abandon till after he became, in judgment of law, capable of managing his own business. . The extent of this habit of intemperance, and how far it disabled him from the transaction of business, is not so clear. He became of age in the winter of 1836. Previous to this time, in the fall of 1835, he came to Williamsville, which is situated on the main road about ten miles east of Buffalo; and during his stay there, he made a contract for the purchase of certain mill property and village property for the price of $15,000, and gave a note with sureties for the payment of $500 towards the purchase money. In his negotiation for the purchase of this property, he did not certainly discover any incapacity in making a bargain, and this contract was probably a good one. He was, however, at that time legally incapacitated to contract; and upon his return to Pennsylvania, his guardians refused to permit him to complete the contract. It was consequently abandoned by him. At the time Brown was at Williamsville, in the fall of 1835, Hutchinson, the other party to these suits, resided there, and had a tavern property in that place. The tavern had been burned a year or two previous, and a stone building had been erected, and was nearly completed at that time, upon the scite of the old tavern. This

property, Hutchinson, upon application to him by Brown for that purpose, offered to sell to Brown for $8,000, in the state it then was. No bargain was then made in relation to it. In the fall of 1836, Brown, having become of age, again came to Williamsville, and it would seem that he came with the determination of purchasing some property in that place, and making it his permanent residence. Before he came he caused inquiries to be made whether the stone tavern of Hutchinson was still for sale, and ascertained that it was before he left Pennsylvania. He arrived in Williamsville the Saturday previous to the general election in November, 1836. He was about the place for a week; and from the testimony it would appear that he very soon began to make inquiries about different properties in that place, with a view of purchasing. During the election he inquired of at least two persons, whether he had better purchase the Hutchinson property at $10,000, or the Martin Smith property at $8,000 or $9000. On the evening of the third day of election, Hutchinson was at King's tavern, (which tavern had been opened only a few days previous, and where the election was held the last day,) where a number of persons were, among whom were Brown and two or three of his friends. Hutchinson called in several bottles of wine and liquor, and invited all who were in the bar-room to drink. Brown, who was then somewhat the worse for liquor, seems to have drank with the others, though without any particular invitation from Hutchinson. Towards the close of the evening, Hutchinson asked Brown and two or three of his (Brown's) friends to go over to his house to supper, where they went and took supper, and Brown and Reinwault, his friend remained there all night.

Previous to this time, Hutchinson had ascertained from Reinwault that Brown was worth a considerable property. He had also told King that he should probably be able to sell his tavern stand to Brown, if no one interfered with him. This conversation was had with King for the reason, as it appears, that King and one Jennings had become owners of the Oziel Smith property, and Jennings had offered to sell the one-half to Brown for $9,000. Roch, who was Brown's agent in relation to the Oziel Smith property, was at Hutchinson's with Brown at supper; and after he had gone home and got to bed that night, Hutchinson came to his bed-room and told him he thought he should be able to sell his property to Brown if Roch would keep still about it, and if he did so, it should be as good as $500 to him. Upon that night also Brown informed Reinwault, after they went to their room, that he thought of purchasing Hutchinson's tavern. Reinwault remonstrated against his making so large a purchase on election day, and advised him in substance to be quite sober when he made so considerable a trade. In the next morning, Brown, after he rose, took a glass of liquor, and afterwards Brown and Reinwault went to Roch's house to breakfast. Brown here told Roch that he wanted that he and Reinwault should keep Hutchinson's tavern which he was about purchasing. After breakfast they went to Hutchinson's again; and soon after, Hutchinson and Brown went together into the garden. After their return, they proposed to go to Buffalo to have a contract drawn in relation to the sale of the tavern. Brown was negotiating with Roch and Reinwault about leasing the tavern to them, and finally agreed to lease it to them at the rent of

$500 per annum, with a room for himself, and board for himself, and stabling for his horses. Hutchinson told them (Roch and Reinwault) that the property was worth $10,000, and that he had been offered $600 or $700 rent for it, and that his profits were $20 or $30 per day; and that if they took it at the rent at which Brown proposed to let them have it, they could clear enough to buy the tavern in a few years. They all then went to Buffalo, and stopped at a tavern at which the Williamsville people did not generally stop, and soon after went into a lawyer's office, where a contract was drawn acccording to the statements of Hutchinson, assented to by Brown, and was finally executed by them both. By this contract Brown was to pay $10,000 for the property—$500 down, $4,500 on the 1st of May then next, and the balance in installments to be secured by mortgage. According to the testimony of Reinwault, Brown had been drinking; but according to the testimony of others, he manifested no evidence of intoxication after his return to Williamsville, which they did the same evening. Brown returned to Pennsylvania on the Saturday afterwards, and came to Williamsville again about the middle of April, 1837, when, after he had remained a few days, he paid the $4,500, took a deed of the premises, and executed his mortgage for the other payments.

It also farther appears that the stock of the Buffalo and Williamsville McAdam Road was subscribed in 1836, and the road was built in 1837—that the travel upon this road was greater in 1836, and the business at the Williamsville tavern better in that year, than any other year before or since. There was much contradictory evidence to show the value

of this property in 1836, and what Hutchinson had offered it for—some placing the value as low as $4,000, and some as high as $10,000. There is considerable evidence to show that Brown expressed himself satisfied with his bargain long after it was completed, and that he did not complain of being defrauded until proceedings were commenced or about being commenced for the foreclosure of the mortgage.

The whole case presented by the testimony is such, that if the question before the court arose upon a bill filed by Hutchinson against Brown for the specific performance of the contract, I am satisfied this court, in the exercise of its discretion in such cases allowable, would not give the complainant any relief, but leave him to such redress as he could obtain at law. This would be mainly upon the ground that the price to be paid was excessive, and that, connected with the other circumstances, would be sufficient to justify the court in denying an application for a decree for a specific performance, if applied for by Hutchinson. But that is a very different thing from setting aside a solemn conveyance on the ground of fraudulent representations—a very different thing from declaring an executed contract void for fraud. There is certainly something in the situation of the parties, which appears to make the contract unequal. One, a man of mature age, accustomed to trade, acquainted with the value of property, and sagacious to foresee changes : the other, a young man just arrived at years of legal discretion, confident as young men are in their judgment, confident of his own ability to make bargains, and unfortunately addicted at least in some degree, to habits which are not the most favorable

to a cool judgment or a discriminating sagacity. Yet

all this is not sufficient to set aside the contract, particularly when it has been executed by a solemn deed. Brown charges in his bill, that there were fraudulent representations made to him as to the value and income of the property which he was induced to purchase. It is a little remarkable that there is nothing in the proofs to show when the bargain was made, upon whose application it was made, nor what were the representations of Hutchinson to Brown at the time it was made. I now refer to the verbal agreement which finally resulted in the written contract. This verbal agreement must have been concluded some time between Saturday, preceding the election, and the morning of the day after the election. Probably it was finally concluded specifically on the morning after the close of the election, though it is equally probable that Brown had before that time determined to purchase at the price which Hutchinson asked. It is quite clear that he determined to act almost entirely upon his own judgment. He did not ask the advice of Roch, or King, or Reinwault. Consequently, the precautions which Hutchinson had taken to prevent the communication of their unfavorable opinions of the purchase, were, in point of fact, of no avail. Brown seemed determined to purchase, contrary to the advice of Reinwault. There were no fiduciary relations existing between Brown and Hutchinson, of which the latter could take advantage. It is not known what representations Hutchinson made to Brown to induce him to purchase, or whether Brown did not, in point of fact, apply to Hutchinson to purchase. It is true that this is not absolutely necessary to be known, if sub-

sequent circumstances point clearly to facts and re-presentations which must have necessarily existed and been made.   Circumstantial evidence is admissible in cases like this, if it shadows forth clearly fraudulent acts, fraudulent representations, and a fraudulent intent.   Chancellor Kent says : " A de-" duction of fraud may be made, not only from de-" ceptive assertions and false representations, but " from facts, incidents, and circumstances which may " be trivial in themselves, but decisive evidence in a " given case, of a fraudulent design."

In this case, the only representations as to value and income of the property, as proved to be made by Hutchinson, are the representations made by him to Roch when he was negotiating for a lease of the property of Brown.   Suppose we assume this as evidence that he used the same representations to Brown as an inducement to purchase ; yet, it is in proof that these representations were not false.   He had been offered for the property what he said he had.   His daily receipts from the property were about what he said they were.   When this bargain was made, both parties were present, with the property at hand where it could be inspected.   Both parties must have known, or be presumed to know, its present value, and the prospective advantages.   In such case it seems now a well settled rule, that an assertion by a vendor as to the value of the property, though false, forms no substantive ground of relief.   It must be understood to be his opinion of the value, as to which the other party is supposed to be as capable of forming a judgment as the vendor.   6 Paige, 254.   A misrepresentation as to the past income of the property, may be subject to a different rule.   But in this

case it does not appear that any such representations <span>Dec. 1840.</span>
were made to Brown ; and all the representations in
relation to the income which were made, are suffi-
ciently sustained by proof to have been true.

The probable motives which influenced the two
in making the contract, may, I think, be inferred from
a few facts, partly historical and partly contained in
the testimony. The year 1836 was a year of the
wildest speculation. Men took leave of their judg-
ment and gave reins to the imagination, and revelled
in anticipated wealth. Buffalo and its vicinity is
known not to have been influenced in a small degree
by this unregulated spirit. This year was a good
year for travel and for a tavern business. The stock
of the McAdam road from Buffalo to Williamsville,
was this year taken up. Its anticipated effect upon
the value of Williamsville property, was magnified
by the exaggerating influence of a speculating spirit.
The disastrous effects of Rathbun's failure had not
begun ro be felt, and the sanguine in Williamsville
believed that their property would be greatly enhan-
ced and their business greatly increased by the com-
pletion of the McAdam road. Brown had been
there the year before, and made a bargain out of
which he might have realized something handsome,
if his guardians had not compelled him to relinquish
it. Smarting under this imaginary loss, and desirous
of showing the sagacity of his own judgment, he de-
termined to make a purchase in Williamsville to show
his over cautious guardians what he could do when
left to himself. With the sanguine spirit of youth,
the future was prosperous and smiling in prospect,
and doubtless painted by his imagination in glowing
colors ; while the remarks which he would be likely

to hear from those around him, would not be calcu-lated to sober his anticipations. On the other hand, Hutchinson, though probably partaking something of the same spirit, yet perhaps had sufficient sagacity to doubt whether all these golden dreams would be eventually realized. He was willing and desirous of taking the prudent side and sell, while Brown was anxious to take the sanguine side and purchase. In this spirit I have no doubt the bargain was made. In this spirit it might have been made without any just imputation of fraud upon Hutchinson.

It is difficult for us, in these days of something more than sober reaction, to carry ourselves back, even in imagination, to the times of 1836. It is difficult for us now to realize the spirit which then prevailed. While I have no doubt that Brown agreed to pay more for the property than it was worth, yet I am not quite so clear but my own judgment is influenced more by events that have since occurred or have been since developed, than by any recollection of what my own judgment was in those days. Such influences I fear may have operated upon the witnesses who have testified to the value of the property. This testimony is very discordant; and if applicable, cannot be relied upon. I am induced to think such testimony is not proper; and if proper, it is about equally balanced. Upon the whole, under this branch of the case, I am constrained to say that if this contract is to be set aside on account of excess of price, many contracts made in 1836 would also be set aside for the same cause; and that there is not sufficient proof to authorise me to set it aside on the ground of false and fraudulent representations.

There is another position taken in this case, which

deserves consideration, and which has been urged by the counsel of Brown with considerable confidence. They insist that the proof shows that Brown, at the time he made the contract, was in a state of intoxication; and that Hutchinson took such fraudulent advantage of Brown's situation, and used such contrivances to keep him in that situation until the contract was finally executed, as to make it, in estimation of law, void.

The books contain a large number of cases in relation to the rescission of contracts entered into by a person in a state of intoxication. They very properly make a distinction generally between the cases where the intoxication was voluntary, and where the deceived party was enticed to drink by the procurement and contrivance of the party with whom the contract was made. In Prentice vs. Achone, 2 Paige, 30, Chancellor Walworth lays down the broad rule that a person deprived of his reason in consequence of voluntary intoxication, is incapable of making a valid contract. Our statute also contemplates the same disability in the case of habitual drunkards, and treats it as a species of insanity which incapacitates the drunkard from making a valid contract, or even from the management of his own estate.

When the intoxication has become habitual so as wholly to derange the mind, or even to expose it to the frequent recurrence of temporary derangement in consequence of drink, there can be no doubt. Neither can there be any doubt in the case of a single instance of intoxication, when it is so extreme as to deprive a man of his reason, but that a contract executed by him in that condition, would be invalid. But there are various stages of mental incapacity

produced by the temporary excitement of strong drink, ranging from almost a complete possession of all the mental powers, to a state amounting to idiocy or madness. Different temperaments are also affected in different degrees and in a different manner by the use of liquor ; so that in every case where the intoxication is not induced by the person making a bargain with an intoxicated man, it becomes a nice question of fact whether the effects of the intoxication are such as wholly to incapacitate the individual, suffering under its influence, from contracting.

I apprehend, however, in all the cases where an argument is sought to be set aside on the ground of the intoxication of the complainant, that evidence of intoxication, particularly of that intoxication which is induced by the arts of the other party, will not be admitted, unless there is a distinct allegation in the bill to that effect, and that the party was incapable of transacting business. In Prentice vs. Achone, 2 Paige, 30, the bill alleged that the deed was obtained by fraud and undue influence when the grantor was incapable of transacting business. In Cook vs. Clayworth, 18 Vesey, 12, the bill charged that the agreement was obtained from the party while in a state of complete intoxication. In Say vs. Barwick, 1 Vesey and Beames, 195, the bill alleged contrivance of the other party to keep the lessor in a state of intoxication.

Cory vs. Cory, 1 Ves. Sen. 19, is a short case, and it does not appear what were the allegations in the bill ; but the Lord Chancellor refused in that case to set the agreement aside, though one of the parties was drunk.

Johnson vs. Meldicott, 3 Peer Williams, 131,

*Note,* does not contain the allegations of the bill; but that case decides that having been in drink, is not any reason to relieve a man against an agreement gained from him under such circumstances, unless it was through the contrivance of him who gained the deed.

It appears to me reasonable and consistent with the general rules governing Chancery pleadings, and the evidence admissible under them, that a party should not be permitted to give in evidence the intoxication of the party seeking to set aside an agreement, unless he has laid the foundation for such evidence by the allegations of his pleading. And particularly that this should not be allowed, when the evidence proposed to be offered goes to charge the other party with arts and contrivances to induce and continue the intoxication, with a view of taking advantage of it. This, of itself, is a substantive ground for setting aside an agreement so procured; and it is also a grave charge against the other party, and should be distinctly and specifically set forth to inform the other party what he has to meet.

In this case, the charge is that Hutchinson procured the contract from Brown by false and fraudulent representations of the value, the prospects, and the income of the property which was the subject of the agreement, and that he " used many other fraudulent devices to deceive and defraud Brown." This is altogether too vague and general, to admit evidence of intoxication at the time the contract was executed, or that such intoxication was induced by the contrivances of Hutchinson.

It should be the office of pleadings in Chancery, to state clearly and perspicuously the grounds upon

which relief is sought or the defence rests; and the pleader should not be permitted to go beyond these allegations in his proofs. No one, upon reading this cross bill, would infer that the contract was sought to be set aside on the ground of the intoxication of Brown: there is nothing in it even hinting at any mental incapacity on his part; and therefore I think that the proofs in relation to such mental incapacity, cannot be heard.

But if I am wrong in this conclusion, and Brown can properly use the testimony he has offered, I am constrained to say that there is not sufficient evidence to satisfy me that Brown was in that state of mental incapacity from intoxication at the time he made the contract, as to induce this court to invalidate it from that cause. It appears, indeed, that Brown was considerably excited by drink during the election; but it does not appear from the testimony of any one except Reinwault, that this excitement amounted to incapacity; and Reinwault did not communicate to any one, at the time, his idea of Brown's situation. It does not appear clearly, that Brown was induced to drink, particularly by Hutchinson. It does not appear at what time the contract was agreed upon between them; and I suppose if the terms of the bargain had been agreed upon when Brown was sober, although it was afterwards reduced to writing and signed by him when he was excited by liquor, yet that this circumstance would not invalidate the contract, unless the terms of the written contract were different from that of the verbal.

Besides all this, there is no pretence that Brown was intoxicated when he paid the money and took the deed, some six months afterwards, and when he

remained in Williamsville some days before he did <span>Dec. 1840.</span> so. This was in some sort a confirmation of his contract, though I will admit not sufficient, if it was done <span>Anonymous.</span> under ignorance of his legal rights. But we hear of no suggestion at that time, or at any time near that time, that the contract was obtained from Brown while under a state of intoxication.

So that upon the proofs, if they were admissible, I should be constrained to deny Brown any relief. This contract must share the fate of many other contracts made about that time when there was a general excitement in relation to property, which in some degree unsettled the general good judgment of community. Brown has only shared in that excitement in common with many older and steadier men; and he must, in common with them, support as well as he can the disappointment of his hopes and the loss of a share of his property.

There must be the usual order of reference in the first cause, and the bill in the second cause must be dismissed, with costs to be taxed.